66 A.3d 615

**PROPERTY & CASUALTY INSURANCE GUARANTY CORPORATION**

v.

**Belinda BEEBE–LEE, et al.**

**No. 64, Sept. Term, 2012.**

Court of Appeals of Maryland.

April 25, 2013.

As Revised on Grant of Reconsideration June 20, 2013.

476

Albert J. Mezzanote, Jr. and Emily A. Daneker, (Whiteford, Taylor & Preston, L.L.P., Baltimore, MD), on brief, for Petitioner.

Dennis F. O'Brien, (Dennis F. O'Brien, P.A., Bel Air, MD; J. Mitchell Lambros of Lambros & Lambros, Cockeysville, MD), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, McDONALD, JJ.

BARBERA, J.

When a property or casualty insurer becomes insolvent, the Maryland Property & Casualty Insurance Guaranty Corporation ("PCIGC") assumes responsibility for any outstanding claims or litigation. In the case before us, an insurance company settled a claim with an insured party but became insolvent before the agreement could be approved by a court. Maryland Code (1995, 2011 Repl.Vol.), § 9–306(e)(1)(ii) of the Insurance Article,[1] states that PCIGC "may review settlements, releases, and judgments to which the insolvent insurer or its insureds were parties to determine the extent to which the settlements, releases, and judgments may be properly contested."

PCIGC argues that the insurance company should not have been liable on the claim and seeks to challenge the settlement

---

1. All references to the Maryland Code hereinafter are to the Insurance Article unless otherwise noted.

reached by the parties. PCIGC also contends that it should not have to pay its statutory maximum on both an underlying insurance policy and an umbrella policy when the claims stem from a single incident. The Court of Special Appeals, in an unreported opinion, held that PCIGC may challenge a settlement only on limited grounds, such as fraud or collusion, and the corporation bears the burden of proving its reason for challenging a claim. Additionally, the Court held that PCIGC was liable for the statutory maximum on both policies.

We granted a petition for a writ of certiorari, *Property & Casualty Insurance Guaranty Corp. v. Beebe–Lee*, 428 Md. 543 (2012), to answer the following questions:

1. Did the Circuit Court err in ruling, and the Court of Special Appeals err in affirming, that [§ 9–306(e)(1)(ii) ] provides PCIGC with only a limited right to contest settlements entered into between a claimant and an insolvent insurer, despite the absence of such limiting language in the governing statute?

2. Did the Circuit Court err in declaring, and the Court of Special Appeals err in affirming, that PCIGC is liable to Claimants for twice its statutory limit of liability on a claim for a single bodily injury where the insolvent insurer provided both primary coverage and umbrella coverage?

For reasons we shall explain, we answer no to both questions and affirm the judgment of the Court of Special Appeals.

I.

While visiting her grandparents at their home in Jefferson, Maryland on June 30, 2003, nine-year-old Ashley Beebe–Lee was seriously injured while riding a go-cart.[2] Prior to the accident, Ashley and another grandchild asked their grandfather William Lee if they could take the go-cart out of the garage. Lee initially resisted, telling them that the go-cart

---

**2.** The account of the accident is based on unsworn statements made by Ashley's grandparents, William and Frances Lee, within a month of the accident.

had not been running for a year or more. After the grandchildren washed dirt and dust off of the vehicle, Lee decided to see if it would operate. The go-cart's engine started up, and Ashley drove the vehicle around the driveway and back lot of the property. At one point, Ashley lost control of the go-cart and drove into a trailer. She suffered severe injuries to her right arm and shoulder, and was flown ultimately to Children's National Medical Center in Washington, D.C. for treatment. She sustained two severed arteries, a broken collar bone, and two broken ribs in the accident, among other injuries. Ashley reportedly has permanent scarring and was estimated at one point to have roughly 62 percent impairment to her body, with serious impairment to her right arm, hand, and fingers.[3]

Ashley's mother, Belinda Beebe–Lee, on behalf of her minor daughter (hereinafter Respondents), hired an attorney and presented notice of a bodily injury claim against the Lees on November 3, 2003. Respondents filed the claim with the Lees' insurer, Shelby Casualty Insurance Company ("Shelby"). The Lees had two policies with Shelby, one that provided homeowner's personal liability protection up to $500,000 and a second umbrella policy that covered up to $1 million. Respondents' attorney communicated with Shelby by letter and fax on multiple occasions between December 2003 and March 2006, discussing the insurance company's liability investigation. Respondents forwarded copies of medical bills to Shelby along with photographs documenting Ashley's injuries and her recovery.[4] As of January 20, 2006, Ashley's medical treatment totaled more than $155,000, and one doctor estimated the cost of future surgical procedures at roughly $300,000. After initially offering $750,000 to settle the claim on April 19, 2006,

---

**3.** This information is based on a letter sent by her then-attorney Donald S. Saiontz to Shelby Insurance Company summarizing information contained in Ashley's medical reports.

**4.** Respondents received a check for $5,000, the limit of medical payments coverage in the homeowner's policy, within a few months of filing a claim. At Respondents' request, Shelby advanced an additional $7,500 on May 12, 2005, against a future payout on the claim in order to allow the family to pay for immediate medical expenses.

Shelby raised its offer to $1 million in an email a month later, with a proposal to structure $500,000 of the settlement as an annuity. Gary Murton, a litigation specialist at Shelby, wrote an email to Respondents' attorney in which he stated, "You and I understand any settlement must be approved by the court and that the courts certainly look favorably upon the settlement to which we have agreed." [5] In an affidavit signed on July 10, 2009, Murton said that he viewed court approval as a "ministerial" matter "that did not prevent the settlement agreement from being binding."

On June 28, 2006, the Texas Department of Insurance sought, and was granted, a court order placing the Vesta Insurance Group and its affiliates, which included Shelby, into receivership. After finding that Shelby was insolvent, the District Court of Travis County, Texas, ordered that the company be liquidated on August 1, 2006. Respondents learned of Shelby's problems in late July and asked the company to place the $1 million settlement in escrow. Shelby responded by directing Respondents to PCIGC, describing it as the "only recourse" available.

Respondents sent a letter on September 18, 2006 to PCIGC, informing it of the $1 million settlement reached with Shelby and that company's liquidation. PCIGC and Respondents' attorney exchanged letters through the remainder of 2006 and early 2007. PCIGC stated that it was not clear whether Shelby had a duty to defend the claim, and it sought additional information about the policies and the accident to assist it in determining what its statutory obligations were under the circumstances. Respondents maintained that Shelby had a duty to defend and that, under § 9–306(c),[6] PCIGC was re-

---

**5.** Shelby later confirmed the arrangement in a letter and agreed to toll the statute of limitations pending court approval of the settlement. Respondents' attorney received a letter on June 14, 2006, regarding potential annuity plans and the tax benefits of annuities.

**6.** Section 9–306(c) reads as follows: "The Corporation shall be deemed the insurer to the extent of the Corporation's obligation on the covered claims and, to that extent, shall have the rights, duties, and obligations

quired to assume all of the obligations and duties that Shelby would have had if the company had not become insolvent. On January 31, 2007, PCIGC informed Respondents that its investigation failed to find any breach of duty on the part of the Lees and, consequently, it declined "to make any offer of settlement." [7]

Respondents filed a complaint against PCIGC seeking declaratory relief in the Circuit Court for Baltimore County on March 11, 2009. Respondents asked the court to find that they settled the claim with Shelby for $1 million and that PCIGC was obligated to pay $599,800 on the claim under the two insurance policies. The parties filed cross-motions for summary judgment and the matter came on for a hearing in the Circuit Court on May 19, 2010.

In an order issued July 12, 2010, the Circuit Court denied PCIGC's motion for summary judgment and granted Respondents' motion. The Circuit Court found that, as a matter of law, Respondents and Shelby had a binding settlement agreement. Consequently, the Circuit Court ruled that this agreement constituted an "unpaid obligation" arising out of the Shelby policies for which PCIGC was responsible. The Circuit Court further found that PCIGC's right to review settlements gave it the ability to contest a claim only if there was mistake, fraud, oppression, collusion, the failure of the insurer to defend, or other similar circumstances. PCIGC had not presented evidence supporting any of these rationales, the Circuit Court found. Additionally, the Circuit Court ruled that there can be multiple claims arising out of a single incident when there are multiple insurance policies in place.

---

that the insolvent insurer would have had if the insurer had not become insolvent."

7. PCIGC argues that Shelby had no basis to conclude that the Lees were legally liable for the go-cart injury and, as a result, the claim should not have been covered by either the homeowner's or umbrella insurance policy. Additionally, PCIGC notes that the umbrella policy excluded recreational vehicles and questions whether the go-cart qualified for coverage.

The Circuit Court therefore concluded that PCIGC was liable in the amount of $599,800 on the two combined policies.

In an unreported opinion, the Court of Special Appeals affirmed the decision of the Circuit Court. The Court held that Shelby was bound by the settlement agreement, even though it had not been approved by a court, and that, in order to properly contest the claim, PCIGC had the burden to prove that the insurance policies did not cover the claim or that the agreement was entered into based on fraud, collusion, or the failure of the insurer to properly investigate the claim. Additionally, the Court held that PCIGC was obligated to pay the statutory maximum twice because there were two policies covering the claim, even though it stemmed from a single incident. In dissent, Judge Shirley M. Watts disagreed that PCIGC was limited in its ability to challenge a settlement, and Judge Watts concluded that PCIGC should be entitled to contest the underlying question of whether Shelby was required to defend the Lees. The present appeal followed.

## II.

### Standard of Review

This appeal is from the Circuit Court's grant of summary judgment in favor of Respondents. In reviewing such an order, we review the record to determine if any material facts are in dispute. *Whitley v. Md. State Bd. of Elections*, 429 Md. 132, 148, 55 A.3d 37 (2012). The parties, in seeking cross-motions for summary judgment, both acknowledged that there were no facts in material dispute. "If no genuine dispute of material fact exists, this Court determines 'whether the Circuit Court correctly entered summary judgment as a matter of law.'" *Id.* (quoting *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.*, 404 Md. 560, 571, 948 A.2d 11 (2008)). "The standard of review of a trial court's grant of a motion for summary judgment on the law is *de novo*, that is, whether the trial court's legal conclusions were legally correct." *Messing v. Bank of America*, 373 Md. 672, 684, 821 A.2d 22 (2003).

 This case hinges on the interpretation of the statute governing PCIGC. As such, "we rely on the often-cited rules of statutory interpretation." *Green v. Church of Jesus Christ of Latter-Day Saints*, 430 Md. 119, 135, 59 A.3d 1001 (2013). "A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Id.* (quoting *Gardner v. State*, 420 Md. 1, 8, 20 A.3d 801 (2011)). We do not look beyond the ordinary meaning of the statute's language where the wording is "plain and free from ambiguity, and expresses a definite and simple meaning." *Employees' Ret. Sys. of Balt. v. Dorsey*, 430 Md. 100, 113, 59 A.3d 990 (2013) (quoting *Dep't of Human Res. v. Hayward*, 426 Md. 638, 650, 45 A.3d 224 (2012)). "When the words of a statute are ambiguous, we attempt to resolve that ambiguity 'by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process.'" *Green*, 430 Md. at 135, 59 A.3d 1001 (quoting *Gardner*, 420 Md. at 9, 20 A.3d 801). "In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense." *Id.*

## III.

*Reviewing and Properly Contesting Settlement Agreements*

 PCIGC was designed with two purposes in mind. The first is "to provide a mechanism for the prompt payment of covered claims under certain policies and to avoid financial loss to residents of the State who are claimants or policyholders of an insolvent insurer." § 9–302(1). The second purpose is "to provide for the assessment of the cost of payments of covered claims and protection among insurers." § 9–302(2). The General Assembly created what was then-known as the Maryland Insurance Guaranty Association in 1971 as a nonprofit, unincorporated legal entity. *Prop. & Cas. Ins. Guar. Corp. v. Yanni*, 397 Md. 474, 482, 919 A.2d 1 (2007). Its structure was based on a 1969 model act drafted by the

National Association of Insurance Commissioners and later adopted by more than 40 states. *Id.*

The PCIGC gained its current name in 1986 after the General Assembly made several changes to its operational structure, transforming it into a nonprofit, nonstock corporation and "declaring that it was not an agency or instrumentality of the State." *Id.* All direct property and casualty insurers in Maryland must be members of PCIGC in order to sell insurance within the state.[8] §§ 9–303, 9–304(b). Insurers are assessed fees in order for PCIGC to fulfill its statutory obligation to pay covered claims of insolvent insurance companies. § 9–306(d).

"The PCIGC statute serves to lessen the impact on Maryland residents insured by insurance companies that become insolvent. The coverage, however, is not absolute." *Med. Mut. Liab. Ins. Soc'y of Md. v. Goldstein,* 388 Md. 299, 318, 879 A.2d 1025 (2005). PCIGC is liable "to the extent of the covered claims existing on or before the determination of insolvency."[9] § 9–306(a)(1). Claims must first qualify as "covered" in order for PCIGC to be obligated to pay them. § 9–301(d).[10] Even then, PCIGC is statutorily limited in the

---

**8.** The subtitle does not apply to life insurance, health insurance, mortgage guaranty insurance, annuities, insurance written on a surplus lines basis (under § 3–301, *et seq.*), insurance written by a risk retention group, or insurance written by an unauthorized insurer. § 9–303.

**9.** PCIGC is also liable for claims arising within 30 days after the determination of insolvency, before the policy expiration date (if it is less than 30 days after the determination of insolvency), or before the insured replaces a policy or cancels it, if done within 30 days after the determination of insolvency. § 9–306(a)(1)(i)–(iii).

**10.** (d) *Covered claim.*—(1) "Covered claim" means an insolvent insurer's unpaid obligation, including an unearned premium:
 (i) that:
 1.A. for insurance other than insurance that covers members of a purchasing group, arises out of a policy of the insolvent insurer issued to a resident or payable to a resident on behalf of an insured of the insolvent insurer; or
 B. for insurance that covers members of a purchasing group, arises out of insurance that covers the members of the purchasing group to

amount it may pay on claims to between $100 and $300,000 per covered claim. § 9–306(a)(2). Parties must exhaust other available sources of coverage before seeking relief through the PCIGC. § 9–310.

PCIGC has the power to investigate claims brought against the corporation, § 9–306(e)(1)(i), and "may review settlements, releases, and judgments to which the insolvent insurer or its insureds were parties to determine the extent to which the settlements, releases, and judgments may be properly contested." § 9–306(e)(1)(ii). PCIGC must "adjust, compromise, settle, and pay covered claims to the extent of the Corporation's obligation" and is required to "deny all other claims." [11] § 9–306(e)(1)(i).

The plain language of § 9–306(e)(1)(ii) ("may review settlements") clearly gives PCIGC the ability to review the settle-

---

the extent that the insurance is obtained by the purchasing group, the insurance is written by an authorized insurer, and the claim is made by a person residing or located in the State; or

2. arises out of a surety bond issued by the insolvent insurer for the protection of a third party that is a resident;

(ii) that is presented on or before the last date fixed for the filing of claims in the domiciliary delinquency proceeding as a claim to the corporation or to the receiver in the State;

(iii) that:

1. except for a surety bond claim, was incurred or existed before, on, or within 30 days after the determination of insolvency; or

2. For a surety bond claim that arises out of a surety bond issued by a domestic insurer, was incurred or existed before, on, or within 18 months after the determination of insolvency, whether or not the surety bond is issued for no stated period or for a stated period; and

(iv) that arises out of a policy or surety bond of the insolvent insurer issued for a kind of insurance to which this subtitle applies.

11. Prior to the recodification of the Annotated Code, this provision could be found at Maryland Code (1957, 1972 Repl.Vol.), Article 48A, § 508:

(a) The Association shall:

&ast; &ast; &ast;

(4) Investigate claims brought against the Association and adjust, compromise, settle, and pay covered claims to the extent of the Association's obligation and deny all other claims and may review settlements, releases and judgments to which the insolvent insurer or its insureds were parties to determine the extent to which such settlements, releases and judgments may be properly contested.

ment at issue here.[12] The power to contest a settlement is further implied from the wording of § 9–306(e)(1)(ii) ("may review settlements ... to determine the extent to which the settlements ... may be properly contested"). The extent of PCIGC's power to review settlements to determine if they may be "properly contested" is what remains unclear. Terms such as "review" and "properly contest" are not defined in the Insurance Article [13] and the parties cite no opinions of this Court, nor have we found any, in which we have previously clarified the meaning of these words. Our review of the legislative history likewise fails to shed any further light on the matter.[14] We can conclude, though, that the use of the modifier "properly" before the word "contested" indicates that there *are* limits to PCIGC's ability to challenge claims even if those limits are undefined.

PCIGC argues that embedded within § 9–306(e)(1)(ii) is the discretion to determine whether a claim could be properly contested, and that this Court should not substitute its judgment for PCIGC's discretionary determination. PCIGC claims it acted in good faith in challenging Shelby's settlement of the claim and maintains that the Insurance Article places no limits on the situations in which it may challenge a settlement. PCIGC contends that the Circuit Court and Court of Special

---

**12.** Before the Court of Special Appeals, PCIGC pursued the argument that there was not a binding settlement agreement between Shelby and Respondent. PCIGC does not advance that argument now, so we shall assume that the agreement was definite and binding even though it was not approved in court.

**13.** Indeed, as far as we can determine, the term "properly contested" appears only in the Insurance Article in § 9–306(e)(1)(ii) and nowhere else in the Maryland Code.

**14.** We found nothing in the legislative history of Maryland Code (1957, 1972 Repl.Vol.), Article 48A, § 508 to assist us in our interpretation. A revisor's note to § 9–306 states that it was derived without substantive change from Article 48A, § 508. *See* Maryland Code (1997), § 9–306 of the Insurance Article. Aside from stylistic changes, we discern no· substantive changes to the provisions at issue here, and the legislative history connected to the revision sheds no further insights.

Appeals improperly read limiting language into the statute, curtailing PCIGC's ability to contest settlements.

Without any Maryland cases on point, both parties point to case law from outside the state in support of their respective positions. PCIGC cites *Lopez v. Texas Property & Casualty Insurance Guaranty Association*, 990 S.W.2d 504 (Tex.App. 1999), for the proposition that a guaranty association has the ability to challenge the underlying liability of a settled claim. In *Lopez*, a judgment was entered against a motorist involved in an accident, and the defending insurance company later became insolvent. *Id.* at 505. The injured parties attempting to collect the judgment and the guaranty association agreed that the motorist had been driving the vehicle without the permission of its owner. 990 S.W.2d at 505. The driver, therefore, was not covered under the insurance policy. *Id.* The court rejected the argument that the guaranty association should be estopped from challenging liability because the insolvent insurer did not raise the issue before the trial court. *Id.* at 506. Instead, the court concluded that the guaranty association was not required to pay the claim because the association was not responsible for claims that were outside the applicable coverage. *Id. Lopez* is distinguishable from the present case because the parties there *agreed* that the driver involved was not covered by the insurance policy. That concession gives a guaranty association a sound reason to "properly contest" a claim, a factor that is not present in the current case because the parties disagree about whether Shelby was required to cover the go-cart accident.[15]

Respondents cite *DeVane v. Kennedy*, 205 W.Va. 519, 519 S.E.2d 622 (1999), in support of the idea that a guaranty

---

15. For similar reasons, we find inapplicable another case cited by PCIGC, *Illinois Ins. Guar. Fund v. Santucci*, 384 Ill.App.3d 927, 323 Ill.Dec. 775, 894 N.E.2d 801 (2008). In *Santucci*, the court found that the insured did not qualify for coverage; therefore the guaranty fund was not required to pay because it was not a "covered claim." 323 Ill.Dec. 775, 894 N.E.2d at 807. A significant difference between that situation and the case *sub judice* is that the Illinois Insurance Code specifically states that the fund is not bound by settlement agreements reached in the year preceding liquidation. *Id.*

association's grounds for contesting a settlement agreement are limited. In *DeVane*, the court considered a statute that allowed for settlement agreements reached prior to insolvency to "be properly contested" by a guaranty association. 519 S.E.2d at 637. The court noted that "settlements are highly regarded and scrupulously enforced." *Id.* The court observed: "Rather than automatically abrogating all settlements entered into by insurers prior to their insolvency, thereby resolutely relieving the [guaranty association] of these obligations, the Guaranty Act impliedly recognizes the validity of these voluntary agreements by absolving the Association's liability therefor only insofar as such agreements 'may be properly contested.'" *Id.* at 637. The court concluded that the guaranty association was able to escape liability only by raising the same defenses available to the insolvent insurer, namely "accident, mistake, or fraud." *Id.* at 637–38.

Like the West Virginia statute, Maryland's Insurance Article does not absolve PCIGC of its responsibility for paying on claims reached by settlement. West Virginia, too, uses the phrase "properly contested" in its statute and, notably, the court construed that phrase as placing limits on the power of a guaranty association.

Another potential source for interpretation is the Post–Assessment Property and Liability Insurance Guaranty Association Model Act ("Model Act"). The Model Act, created by the National Association of Insurance Commissioners, was the basis for Maryland's PCIGC. The Model Act defines the circumstances under which a guaranty association, such as PCIGC, may contest a settlement, release, or judgment. Early versions of the Model Act used the phrase "properly contested,"[16] but more recent iterations have abandoned this language.[17] The Model Act does not define "properly contest-

---

16. We reviewed versions of the Model Act from 1987 and 1996 that included this language. Our research failed to uncover the original version of the Model Act.

17. The 2009 version of the Model Act relied upon by the parties and included in their joint record extract differs from the Maryland statute

ed" and our research failed to uncover the drafter's intent in using this phrase. As a result, we are unable to draw from the Model Act any firm conclusions about PCIGC's power to contest settlements.

The Court of Special Appeals concluded there are at least three instances in which PCIGC could contest a claim:

1) where PCIGC can prove that the insolvent insurer could have contested the settlement agreement prior to becoming insolvent; 2) where PCIGC can prove that the settlement agreement is the result of fraud, collusion, or the insurer's failure to investigate the claim; and 3) where PCIGC can prove that the underlying insurance policy did not cover the claim.

The Court's reasons overlap at times with those advanced by the Circuit Court, but there are differences between them. Notably, the Court of Special Appeals would allow PCIGC to contest the underlying liability of a policy if PCIGC could prove the claim was not covered.

Despite differences in their reasoning, the Circuit Court and the Court of Special Appeals agreed that PCIGC bore the burden to prove one of the rationales for challenging the

in several respects. It does not use the term "properly contested." Instead, the 2009 Model Act states explicitly that a guaranty association is not bound by a settlement agreement if either the settlement is reached within 120 days prior to an order of liquidation *and* the insolvent insurer did not use reasonable care in entering into the settlement, or the settlement was the product of fraud, collusion, or the insurer's failure to defend the claim. § 8, ¶ 6(a)(i). The Circuit Court determined from this language that fraud, collusion, and the insurer's failure to defend are the only reasons available for PCIGC to set aside a settlement agreement. In her dissent, Judge Watts of the Court of Special Appeals disagreed with that reasoning. Judge Watts concluded that the General Assembly did not intend to impose such restrictions on PCIGC because those limitations did not become part of the Maryland statute. We found no commentary or notes in the versions of the Model Act we reviewed that explain why the drafters of the Model Act chose to discard the phrase "properly contested" in favor of the language cited by the Circuit Court and Judge Watts. We also note that the General Assembly has not adopted the language of the 2009 Model Act. Given the differences between the 2009 Model Act and the Maryland statute, we look to other sources apart from the Model Act in construing § 9–306(e)(1)(ii).

settlement. We concur. *See, e.g., In re The Wallace & Gale Co.,* 275 B.R. 223, 230 (D.Md.2002), *vacated in part, on other grounds,* 284 B.R. 557 (D.Md.2002) ("The insurer has the burden of proving any exclusions under the policy."). PCIGC correctly argues that Respondents bore the burden of proving that there is a right to recover under the policies. *Id.* at 230 (citing *North Am. Acc. Ins. Co. v. Plummer,* 167 Md. 670, 678, 176 A. 466 (1935)) ("In an action on an insurance policy, the plaintiff has the burden of proving every fact essential to his or her right to recover."). Respondents met this burden, though, by showing proof of the settlement agreement. PCIGC now bears the burden to show why that claim is excluded from coverage.

PCIGC steps into the shoes of the insurer, but it does so at a particular moment in time, namely after a claim has been settled. *See* § 9–306(c) ("The Corporation . . . shall have the rights, duties, and obligations that the insolvent insurer would have had if the insurer had not become insolvent"). This is significant because an insurer pre-settlement has options in handling a claim that change post-settlement. After the settlement, a party is more limited in the grounds it can assert to get out of the agreement. These grounds include fraud, duress, or mutual mistake. *See Koons Ford of Balt., Inc. v. Lobach,* 398 Md. 38, 46–47, 919 A.2d 722 (2007) (quoting *Binder v. Benson,* 225 Md. 456, 461, 171 A.2d 248 (1961)) (noting that "the usual rule is that if there is no fraud, duress or mutual mistake, one who has the capacity to understand a written document who reads and signs it . . . is bound by his signature as to all of its terms"). In other words, once Shelby reached a settlement agreement, it could not thereafter contest liability unless it had evidence of fraud or other grounds on which to suggest that a settlement was not properly reached.

PCIGC asserts that the Circuit Court and Court of Special Appeals erred by narrowing the grounds on which it can contest a claim. We agree that the statute does not delineate what limitations exist on PCIGC's ability to contest claims, but we disagree with PCIGC that this means there are no limita-

tions. The limitations are implicit in the statute ("properly contested") and in PCIGC's ability to step into the shoes of the insurer at a point in time after a settlement has occurred. The following rationales, identified by the Circuit Court and Court of Special Appeals, all qualify as grounds under which PCIGC could challenge a settled claim: fraud, collusion, duress, mutual mistake, or the failure of the insurer to use reasonable care in investigating or settling a claim (e.g., the policy did not cover the claim). This list is not exhaustive, but we are certain that challenging the underlying liability is not a ground available to PCIGC in these circumstances except as it relates to one of the above-noted rationales. To conclude otherwise would undermine the PCIGC's duty "to provide a mechanism for the prompt payment of covered claims." § 9–302(1). Indeed, a construction of the statute that would allow PCIGC to re-open any settlement agreement for any reason inevitably would thwart the notion of "prompt payment," as far more cases would likely be challenged and litigated.

Our construction of the statute is consistent with its overall purpose, which is to lessen the financial loss suffered by Maryland residents who have claims with insolvent insurers. Given that PCIGC is not meant to be a complete panacea, we are confident that the General Assembly did not intend for claims to be paid when they are the result of fraud, collusion between the insured and insurer, or a failure by the insurance company even to investigate a claim. These situations are the ones in which PCIGC can investigate the facts behind a settlement agreement and properly challenge it. Had the General Assembly wanted to ensure that PCIGC was not bound by any settlement agreement, and could contest underlying claims upon any basis, it could have made this plain in the statute. *See, e.g.,* Texas Insurance Code Ann. § 462.303(a) (West 2013) ("The association is not bound by . . . a judgment, settlement, or release entered into by the insured or the impaired insurer."). We see no indication from the statute or the legislative history available to us that this was the General Assembly's intent.

Notably, PCIGC has the ability to reopen a default judgment in order to challenge the underlying merits of a claim. *See* § 9–315(b). That the General Assembly specifically outlined a method for PCIGC to contest default judgments, but did not similarly describe PCIGC's ability to do so with settlements, is further evidence of the General Assembly's intent that PCIGC not be authorized generally to reopen underlying claims once a settlement agreement has been reached.

The General Assembly reasonably permits PCIGC to contest a default judgment because it is obtained when one party fails to challenge a claim against it. In contrast, a settlement agreement frequently results when two opposing sides reach a compromise that avoids further litigation. Placing limits on the ability of PCIGC to challenge settled claims is consistent with the respect we accord to settlement agreements. *See Calabi v. GEICO*, 353 Md. 649, 653, 728 A.2d 206 (1999) (quoting *Chertkof v. Harry C. Weiskittel Co.*, 251 Md. 544, 550, 248 A.2d 373 (1968)) ("Courts look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony."). We assume that both sides acted in good faith unless there is evidence of a reason, such as fraud or collusion, that would suggest the settlement was improper.

PCIGC raises a concern that this interpretation renders the language of § 9–306(e)(1)(ii) (reviewing settlements to determine if they may be properly contested) merely duplicative of the power given under § 9–306(c) (giving PCIGC the "rights, duties, and obligations that the insolvent insurer would have had"). The Court of Special Appeals agreed that there was some overlap, but noted that § 9–306(e)(1)(ii) conveys broader powers than the insurer on its own would have had, namely the ability to challenge a claim based on collusion or the failure of the insurer to investigate the claim. We agree that there is nothing contradictory about the two provisions. The power to review and contest settlements on grounds such as collusion is not one that the insolvent insurer would have and

it is complementary to the powers available to PCIGC once it steps into the place of the insurer.

PCIGC puts forward two reasons for why the settlement should be set aside: the Lees were not necessarily liable under either policy and the go-cart may have been excluded under the umbrella policy because it was a newly-acquired recreational motor vehicle. The lower courts found that these assertions, standing alone, did not constitute grounds for reopening the settlement. We agree. On the record before us, we have a statement from Mr. Lee in which he said that the go-cart had been acquired several years prior and had not been running for more than a year and a half. As to the liability of the Lees, PCIGC notes that Ashley's mother was aware that she was going to ride a go-cart because the two communicated by phone.[18] That fact alone does not necessarily absolve the Lees of responsibility for supervising Ashley, who was nine years old at the time. Given these bare assertions, without more, we cannot say that Shelby failed to use reasonable care in deciding to settle the claim rather than take a case to trial involving this particular (likely-sympathetic) plaintiff. Just because PCIGC might have been able to negotiate a better settlement or successfully defend the case at trial does not mean it can re-open the settlement agreement now.

In sum, we hold that the plain language of § 9–306(e)(1)(ii) allows PCIGC to review and properly contest settlements to the extent that the insolvent insurer could have had it not become insolvent. In addition, PCIGC may contest settlements on limited grounds that would not have been available to the insurer. Once a claimant demonstrates that there has been a valid settlement, PCIGC bears the burden of showing why the claim is excluded from coverage. These reasons include, but are not necessarily limited to, fraud,

---

**18.** Although neither of Ashley's parents was present at the house, Ashley spoke with her mother by phone several times that day. Ashley's grandmother recounted that Ashley's mother evidently had approved of her riding the go-cart.

collusion, duress, mutual mistake, or the failure of the insurer to use reasonable care in investigating or settling the claim. Absent a showing on the part of PCIGC, it is not entitled to litigate on the underlying merits of a claim that has been settled. Our interpretation is consistent with the purpose and plain language of the statute and is "reasonable," not "absurd, illogical or incompatible with common sense." *See Green,* 430 Md. at 135, 59 A.3d 1001 (quoting *Gardner,* 420 Md. at 9, 20 A.3d 801). Applying that standard to the facts here, PCIGC has not met its burden to show why it can properly contest the claim settled by Shelby. We affirm the decision of the Court of Special Appeals that PCIGC had no sufficient grounds for properly challenging the settlement.

## IV.

### Financial Obligation on Multiple Policies

 The financial limits placed on PCIGC are clear. "The obligation of the Corporation under this subsection shall include only that amount of each covered claim that is in excess of $100 and less than $300,000." § 9–306(a)(2). The question remaining is whether the two policies held by the Lees constitute one "covered claim" stemming from the go-cart accident or whether each policy is a separate covered claim requiring PCIGC to pay up to the full statutory amount twice. Under the first interpretation, PCIGC would be required to pay up to $299,900;[19] under the second, up to $599,800.

"Covered claim" has a rather lengthy definition in the statute, *see supra* note 10, and it is defined, in part, by what it is not. *See* § 9–301(d)(2)–(4).[20] In its simplest terms, a covered claim is "an insolvent insurer's unpaid obligation." We find nothing in the legislative history that further clarifies the meaning of this term. The Court of Special Appeals stated in

---

**19.** Although the statutory obligation is up to $300,000, this has the practical effect of making the ceiling for claims $299,900 because PCIGC is not obligated to pay claims below $100.

**20.** None of the exclusions listed in the statute apply in the present case.

*Igwilo v. Property & Casualty Insurance Guaranty Corp.*, 131 Md.App. 629, 637, 750 A.2d 646 (2000), that determining what is a "covered claim" requires looking at the language of the underlying insurance policy. The court observed that: "The insolvent insurer's obligation under its policy to the insured determines the insurer's 'unpaid obligation,' which in turn determines what constitutes a 'covered claim.' " *Id.*

The language of the primary policy limits Shelby's liability in "any one loss" to no more than "the amount of the insured's interest at the time of loss" or the applicable liability limit. The policy further states that Shelby will pay up to its legal limit of liability for "bodily injury or property damage caused by an occurrence to which this coverage applies" if the insured is legally liable. Again, the policy notes that the total liability "for all damages resulting from any one occurrence" is not more than the liability limits stated in the policy. The umbrella policy notes that the insured is required to maintain underlying policies and that the deductible amounts "apply even in the event that the insurer providing underlying insurance is or becomes bankrupt or insolvent." The umbrella policy also makes reference to liability arising "from an occurrence covered by this policy" and describes the coverage as being in "excess over any other insurance available to an insured." The language of these policies would seem to indicate that, at least as far as Shelby was concerned, the underlying policy and the umbrella policy were two distinct policies. This would seem to support Respondents' claim that each policy represents a separate covered claim under § 9–301(d).

PCIGC, however, views "covered claim" as being all claims stemming from a single incident regardless of whether there are multiple insurance policies involved. PCIGC finds support for this idea in § 9–310(a), (c):

(a) *Exhaustion of rights.*—(1) A person with a claim against an insurer under a policy or surety bond that is also a covered claim against an insolvent insurer shall exhaust first the person's rights under the policy or surety bond.

(2) The amount payable on a covered claim under this subtitle shall be reduced by the amount of any recovery under the policy or surety bond.

\* \* \*

(c) *Nonduplication of recovery.*—A recovery under this subtitle shall be reduced by the amount of recovery from any other insurance guaranty corporation or its equivalent.

PCIGC argues that these provisions, limiting multiple recoveries in particular situations, indicate the General Assembly's intent to narrow the available avenues of recovery.

PCIGC looks to *Igwilo* for support. In *Igwilo*, the Court of Special Appeals considered whether a medical malpractice claim involving a child born with severe brain damage constituted a single claim or could be three covered claims, one each for the mother, father, and child. 131 Md.App. at 634, 750 A.2d 646. The Court held that the parents' claims were derived from the injury to the child and the three claims together constituted one unpaid obligation under the insurance policy. *Id.* at 644–45, 750 A.2d 646. All of the claims stemming from the child's injury therefore were one covered claim, the Court concluded. *Id.* at 645, 750 A.2d 646. As Respondents point out, *Igwilo* is distinguishable from the present case. In *Igwilo*, three people presented a claim out of the same accident, but there was no indication that separate insurance policies were involved.

PCIGC acknowledges that no Maryland courts have addressed the precise issue presented here. Consequently, PCIGC looks to cases from outside the state for support of its contention that the multiple policies should be viewed as a single claim. In *North Carolina Insurance Guaranty Association v. Burnette*, 131 N.C.App. 840, 508 S.E.2d 837 (1998), a child sued a school system after being struck by a motorist while walking to her school bus stop. *Id.* at 838. The school had a primary insurance policy and an excess policy, but its insurer became insolvent. *Id.* at 839. The court concluded that the North Carolina Insurance Guaranty Association was liable only for its single policy limit of $300,000, even though

the school system had two policies. *Id.* at 840. *See also Havens Steel Co. v. Mo. Prop. & Cas. Ins. Guar. Ass'n,* 956 S.W.2d 906, 909 (Mo.1997) (en banc) (holding that it "makes no difference" that an insured had two separate insurance policies because the guaranty association was only responsible for a single covered claim).

Respondents counter that the out-of-state cases cited by PCIGC in support of its argument are inapplicable. Respondents maintain that *Havens* is distinguishable because, even though there were two policies involved, the settlement would not have exhausted the first policy. Respondents claim it was therefore irrelevant that there was a second policy available. Respondents argue that *Burnette* is inapposite for two reasons: (1) the claim involved a school board that was immune to claims above a particular monetary amount, and (2) the North Carolina version of the guaranty statute specifically limited the corporation's liability to a single claim.

Respondents rely on a separate series of cases from our sister jurisdictions in support of their position. For instance, in *CD Investment Co. v. Cal. Ins. Guar. Assn.,* 84 Cal.App.4th 1410, 101 Cal.Rptr.2d 806, 811 (2000), the California Court of Appeal held that each of the five policies at issue in the case constituted a separate covered claim. *See also R & R Industrial Park, L.L.C. v. Utah Prop. and Cas. Ins. Guar. Ass'n,* 199 P.3d 917, 924–25 (Utah 2008) (holding that "an interpretation that only one claim may arise out of a single occurrence would defeat the remedial purpose of the Guaranty Act"); *Conn. Ins. Guar. Ass'n v. Union Carbide Corp.,* 217 Conn. 371, 585 A.2d 1216, 1223 (1991) (holding that the guaranty association's policy limit applied to "each of the underlying claims" brought by victims of a chemical plant disaster filed pursuant to six policies from insolvent insurers). Respondents further argue that if the two policies at issue here were written by separate insurers and both became insolvent, PCIGC would have to cover those claims. Respondents maintain that the result should not be different merely because both policies were with the same insolvent insurer.

The Court of Special Appeals drew support from *CD Investment* and *Union Carbide* in reaching its decision. The Court concluded from the plain language of the statute that each insurance policy issued by Shelby constitutes a separate unpaid obligation. The Court disagreed with PCIGC's explication of the statute, stating that PCIGC's interpretation only made sense if the word "occurrence" was substituted for "claim." The Court determined that PCIGC's approach would be against the remedial purpose of the statute and "would result in an insured losing any benefit from an excess insurance policy."

We agree with the conclusions reached by the Court of Special Appeals and our sister courts. The Insurance Article defines PCIGC's responsibility for "covered claims," not covered "occurrences." Had the General Assembly wished to limit PCIGC's responsibility to a single occurrence, even as to multiple policies, it could have done so within the plain language of the statute. For instance, Minnesota has a statute that indicates specifically that recovery on multiple policies is limited. *See* Minn.Stat. Ann. § 60C.09, subd. 3 (2013) ("Payment of a covered claim, whether upon a single policy or multiple policies of insurance, is limited to no more than $300,000."). Maryland has no similar language in place.

The statute's overall remedial purpose furthers our conclusion that the underlying insurance policy and the umbrella coverage constitute separate covered claims. PCIGC's mission is "to provide a mechanism for the prompt payment of covered claims under certain policies and to avoid financial loss to residents of the State who are claimants or policyholders of an insolvent insurer." § 9–302(1). Given that the claim originally settled for $1 million (based on a total cap on the two policies of $1.5 million), it does not appear that Respondents would receive a windfall or duplicative payments if they receive up to the statutory maximum on each of the two policies. We are mindful that PCIGC does not have unlimited obligations under the statute, and our decision here does not change this maxim. Requiring PCIGC to pay covered claims

under separate policies is reasonably within its statutory mandate.

As a final argument, PCIGC points to § 9–310(a)(1), which states: "A person with a claim against an insurer under a policy or surety bond that is also a covered claim against an insolvent insurer shall exhaust first the person's rights under the policy or surety bond." PCIGC argues that, because it is obligated only up to $300,000 on a covered claim, § 9–306(a)(2), the amount it might owe on the second umbrella policy should be reduced by the amount of money it pays out on the primary policy. PCIGC argues that "the Legislature chose to limit PCIGC's liability and made clear that PCIGC was not intended to provide unlimited coverage, nor was its purpose to make claimants whole."

We disagree that the offset is applicable in this situation. Under § 9–310(a), an insured must first exhaust any rights under a policy before seeking recovery from PCIGC. Here, the policies stem from the same insolvent insurer and the statutory provision cited by PCIGC does not establish a priority as between the claims in such a situation.[21] Offsets generally are meant "to prevent a person from twice receiving benefits for the same loss or otherwise obtaining a windfall, not to reduce the amount of a claim for a loss that remains partially unsatisfied." *Thomsen v. Mercer–Charles*, 187 N.J. 197, 901 A.2d 303, 310 (2006) (quoting *Union Carbide*, 585 A.2d at 1224–25). Respondent settled a claim for $1 million and is seeking a maximum of $599,800 from PCIGC. This does not qualify as a double recovery or windfall. For these reasons, we would affirm the decision of the Court of Special Appeals and permit Respondents to collect under both insurance policies.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. EACH PARTY TO BEAR ITS OWN COSTS.**

---

**21.** Section 9–310(b) establishes a priority of recovery if an insured could recover from more than one guaranty association, but that is not an issue in this case.