******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CONNECTICUT INSURANCE GUARANTY
ASSOCIATION *v.* JOSHUA
DROWN ET AL.
(SC 18975)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued January 8—officially released October 21, 2014*

*Sean K. McElligott*, for the appellants (defendants).

*Kurt M. Mullen*, with whom were *Thomas P. O'Connor* and, on the brief, *Mark D. Robins*, pro hac vice, and *Charles W. Pieterse*, for the appellee (plaintiff).

*Opinion*

ROBINSON, J. This certified appeal presents us with two issues of first impression in Connecticut, specifically: (1) whether an insurer's preinsolvency breach of its duty to defend a claim during an underlying litigation estops the plaintiff, the Connecticut Insurance Guaranty Association (association), from contesting its obligation under the Connecticut Insurance Guaranty Association Act, General Statutes § 38a-836 et seq. (guaranty act), to pay a claim made under the insolvent insurer's policy; and (2) whether certain vicarious liability claims are covered under a professional liability policy (policy), issued by the now insolvent Medical Inter-Insurance Exchange (Exchange), which contained a provision, designated in the policy as exclusion (i), excluding coverage for "injur[ies] arising solely out of acts or omissions in the rendering or failure to render professional services by individual physicians or nurse anesthetists, or by any paramedical for whom a premium charge is shown on the declarations page." The defendants, Associated Women's Health Specialists, P.C. (Health Specialists), Susan Drown and Rodney Drown, individually and on behalf of their minor son, Joshua Drown,[1] appeal, upon our grant of their petition for certification,[2] from the judgment of the Appellate Court reversing the trial court's award of summary judgment in their favor. *Connecticut Ins. Guaranty Assn.* v. *Drown*, 134 Conn. App. 140, 37 A.3d 820 (2012). On appeal, the defendants contend that the Appellate Court improperly concluded that: (1) Exchange's preinsolvency breach of its duty to defend Health Specialists from certain claims made by the Drowns did not estop the association from challenging its liability under the policy; and (2) exclusion (i) plainly and unambiguously excluded coverage for Health Specialists' vicarious liability arising solely from the professional negligence of one of its physician employees. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The record reveals the following undisputed facts and procedural history. In May, 2000, the Drowns filed a medical malpractice action against Health Specialists, a professional corporation that provides obstetrical and perinatal services, and two of its physicians, France Bourget and Richard Holden, in relation to care rendered to Susan Drown preceding, during and following her delivery of Joshua Drown. The Drowns alleged, inter alia, that Bourget and Holden negligently failed to diagnose a placental abruption, which resulted in brain damage to Joshua Drown. The Drowns alleged that Health Specialists is vicariously liable for the physicians' negligence, but did not plead claims of direct negligence against Health Specialists. At some point during the proceedings, the Drowns withdrew the counts against Holden without any settlement of those claims.

During the relevant period, Health Specialists was insured through a professional liability insurance policy issued by Exchange. For a period of approximately six years following notice of the claim, Exchange agreed to provide, and did provide, a legal defense to Health Specialists, without asserting any reservation of rights under the insurance policy. In June, 2006, Health Specialists' counsel, Thomas Anderson, informed Exchange's senior claim representative that, in light of information gleaned through depositions, he had reached the conclusion that liability favored the Drowns and that settlement options should be pursued. In July, 2006, Anderson informed the senior claim representative that a mediation session had been scheduled for September 28, 2006, and that Exchange's presence was required at that session by order of the court because it had the authority to settle the action. In derogation of that order, Exchange failed to send a representative to the September mediation session, and the mediation was continued until December 7, 2006.

In October, 2006, Exchange's general counsel wrote a letter to Health Specialists for the first time to "remind [it] of some important limitations on coverage . . . ." The letter went on to state that, "pursuant to exclusion (i), there is no coverage for [Health Specialists] for its vicarious liability for the acts of individual physicians." Thereafter, Exchange failed to send a representative to the December mediation session, despite having been specifically alerted again by counsel that the court required the presence of such a representative. As a result, the trial court, *Hon. Samuel H. Teller*, judge trial referee, rendered a default judgment on the issue of liability against Health Specialists because Exchange failed to appear at the mandated mediation sessions on behalf of its insured. In March, 2007, Health Specialists and Susan Drown, individually and on behalf of Joshua Drown, executed a settlement agreement whereby Health Specialists agreed that it was liable for the full amount of the policy, $2 million, and that it would assign to the Drowns its rights to recover against Exchange. In return, the Drowns agreed that they would not proceed directly against Health Specialists' assets. The trial court, *Agati, J.*, thereafter dismissed the action against Health Specialists pursuant to Practice Book § 14-19.

In April, 2008, Exchange, domiciled in the state of New Jersey, was declared insolvent by a judge in the Superior Court of New Jersey, Chancery Division. As a result, the association assumed liability for Exchange's obligations to the extent that claims under its policies were covered under the guaranty act, specifically General Statutes § 38a-841.[3]

In February, 2009, the association commenced the present declaratory judgment action, seeking a declaration that it had no obligations under the policy, which Exchange had issued to Health Specialists, for the

Drowns' claims. The defendants filed counterclaims seeking declarations that: (1) the association was estopped from denying coverage by virtue of Exchange's breach of its duty to defend, failure to reserve its rights, and failure to honor its contractual obligations; (2) the policy provided coverage for the claims in the underlying action in the amount of $2 million; and (3) those claims are " '[c]overed claim[s]' " under the guaranty act as defined by General Statutes § 38a-838 (5).[4]

Thereafter, the association filed a motion for summary judgment on its declaratory action on the ground that exclusion (i) of the policy precluded coverage of the underlying claims and, therefore, the claims were not " '[c]overed claim[s]' " as defined by § 38a-838 (5).[5] The defendants filed a cross motion for summary judgment on the ground that the underlying claims were covered under the policy and that, therefore, the association was statutorily obligated to pay three covered claims to the Drowns in the amount of $1,199,700. The trial court denied the association's motion and granted the defendants' cross motion. The trial court concluded that both parties had offered reasonable interpretations of exclusion (i) and, therefore, the contract should be construed in accordance with the reasonable expectations of the insured that the claims would be covered. The trial court further concluded that Exchange's breach of its obligation to provide a defense had resulted in a default being entered against Health Specialists, and that the association was, therefore, liable to the same extent as Exchange would have been for such a breach. The trial court thereafter rendered summary judgment in favor of the defendants on both the association's complaint and the defendants' counterclaims.

The association appealed to the Appellate Court, which reversed the trial court's judgment. *Connecticut Ins. Guaranty Assn.* v. *Drown*, supra, 134 Conn. App. 159. In a unanimous decision, the Appellate Court concluded that exclusion (i) unambiguously precluded coverage for the vicarious liability claims asserted against Health Specialists. Id., 156. The Appellate Court rejected the defendants' argument that exclusion (i) barred only a claim based on the negligence of a physician " 'for whom a premium charge is shown on the declarations page,' " concluding that this construction would contravene rules of grammar and the last antecedent rule of contractual or statutory construction. Id., 149–52. The Appellate Court further concluded that the construction yielded upon application of these rules is supported by the definitions of persons insured under each coverage part. Id., 151 n.9. It also disagreed with the defendants' contention that the association's construction of exclusion (i) rendered Health Specialists' coverage under the policy illusory, noting that there were some circumstances in which claims predicated on vicarious liability

would be covered. Id., 152–54. Finally, the Appellate Court concluded that Exchange's breach of its duty to defend Health Specialists did not estop the association from enforcing the policy exclusion because, under the act, the association is liable only for " '[c]overed claim[s]' " as defined by § 38a-838 (5). Id., 156–59. Accordingly, the Appellate Court remanded the case to the trial court "with direction to deny the defendants' cross motion for summary judgment, to grant the association's motion for summary judgment and to render judgment thereon for the association." Id., 159. This certified appeal followed. See footnote 2 of this opinion.

On appeal, the defendants contend that the Appellate Court improperly determined that: (1) Exchange's pre-insolvency breach of its duty to defend did not estop the association from contesting its obligation to pay claims under the policy; and (2) exclusion (i) precluded coverage for the Drowns' vicarious liability claims against Health Specialists. We address each claim in turn.

I

We begin with the defendants' claim that the Appellate Court improperly concluded that Exchange's breach of its duty to defend Health Specialists, which occurred while Exchange was a solvent insurer, did not estop the association from challenging its obligations under the policy. The defendants contend that, under the guaranty act, the association stands in the shoes of Exchange, an insolvent insurer, and, therefore, is responsible to pay the remedy for Exchange's breach of its duty to defend, namely, the association's statutory liability for a portion of the $2 million coverage limits that formed the basis for the default judgment and settlement agreement between the Drowns and Health Specialists. See, e.g., *Missionaries of Co. of Mary, Inc.* v. *Aetna Casualty & Surety Co.*, 155 Conn. 104, 114, 230 A.2d 21 (1967). The defendants rely on, inter alia, this court's recent decision in *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 789, 900 A.2d 18 (2006), which noted that the guaranty act does not "alter the usual methods of interpreting insurance policies," and *Hall* v. *MPH Transportation, Inc.*, 58 Pa. D. & C.4th 482, 502 (Com. Pl. 2002), which stated that a guaranty association "inherits both the feats and sins committed by the former insurer while solvent and reaps the benefits of the insurer's achievements, and suffers the consequences of its transgressions, during its solvency." In particular, the defendants cite *Hall* in support of their argument that "principles of basic fairness" preclude the association from "simply [ignoring Exchange's] breach of the duty to defend and the litigants' reasonable reliance on Judge Teller's default."

In response, the association argues that the Appellate Court properly concluded that, under the guaranty act, specifically § 38a-841, it "cannot be held liable on

account of acts or omissions of the insolvent insurer where there is no covered claim." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Drown,* supra, 134 Conn. App. 159. The association then relies on the guaranty act's definition of " '[c]overed claim' " in § 38a-838 (5), and this court's decision in *Potvin* v. *Lincoln Service & Equipment Co.*, 298 Conn. 620, 640, 6 A.3d 60 (2010), to support its argument that it is not a "full service insurer"; accordingly, an insolvent insurer's "conduct in handling or mishandling a claim does not give rise to a covered claim" insofar as, under its statutory mandate, the association "can only be liable for a claim which arises out of and is within the coverage of the insolvent insurer's policy." The association then argues that *Connecticut Ins. Guaranty Assn.* v. *Fontaine,* supra, 278 Conn. 779, is not controlling because that decision involved only whether the contra proferentem rule of construction applied in determining the association's obligations under a policy issued by an insolvent insurer, and did not concern the effect of the insurer's conduct on the association's obligations. It also claims that the Pennsylvania court's decision in *Hall* v. *MPH Transportation, Inc.*, supra, 58 Pa. D. & C.4th 482, is both unpersuasive and distinguishable. We agree with the association and, accordingly, conclude that Exchange's preinsolvency misconduct during the underlying litigation does not estop the association from challenging the existence of a covered claim, which is the predicate for its liability under the guaranty act.

By way of background, we note that the "association is a creature of statute, and any basis for liability must be found within the provisions of the guaranty act, which define the scope and extent of the association's liability." *Potvin* v. *Lincoln Service & Equipment Co.*, supra, 298 Conn. 629. " 'The association was established for the purpose of providing a limited form of protection for policyholders and claimants in the event of insurer insolvency. The protection it provides is limited based upon its status as a nonprofit entity and the method by which it is funded. Specifically, the association is a nonprofit legal entity created by statute to which all persons licensed to transact insurance in the state must belong. See General Statutes §§ 38a-838 [7] and 38a-839. When an insurer is determined to be insolvent under § 38a-838 [6], the association becomes obligated pursuant to § 38a-841, to the extent of covered claims within certain limits.' "[6] *Esposito* v. *Simkins Industries, Inc.*, 286 Conn. 319, 329, 943 A.2d 456 (2008), quoting *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 451, 705 A.2d 1012 (1997). "Pursuant to . . . § 38a-841, the association is authorized to pay only covered claims, and must deny all other claims. In order to be reimbursable by the association, a claim against the association must be encompassed within the definition of a covered claim . . . ." *Hunnihan* v. *Mattatuck Mfg.*

*Co.*, supra, 449. The guaranty act defines the term
" '[c]overed claim,' " in relevant part, as "an unpaid
claim, including, but not limited to, one for unearned
premiums, *which arises out of and is within the cover-
age and subject to the applicable limits of an insurance
policy* to which sections 38a-836 to 38a-853, inclusive,
apply issued by an insurer, if such insurer becomes an
insolvent insurer after October 1, 1971 . . . ." (Empha-
sis added.) General Statutes § 38a-838 (5).

Insofar as the association's liability under the guar-
anty act is limited to "covered claims," we agree with
the Appellate Court that we must determine whether
an insurer's preinsolvency conduct in treating a claim as
covered by the policy operates to estop the association
from revisiting that determination and enforcing its own
contrary view of the policy provisions. See *Connecticut
Ins. Guaranty Assn.* v. *Drown*, supra, 134 Conn. App.
159. As the Appellate Court noted, this issue presents
a question of law guided by our well established process
of statutory interpretation pursuant to General Statutes
§ 1-2z. See id., 157. We do not, however, write on a
"blank slate" in determining whether a potential liability
constitutes a " '[c]overed claim' " as defined by § 38a-
838 (5), but instead, are guided by this court's previous
decisions construing that provision. *Esposito* v. *Sim-
kins Industries, Inc.*, supra, 286 Conn. 328; see also,
e.g., *New England Road, Inc.* v. *Planning & Zoning
Commission*, 308 Conn. 180, 186, 61 A.3d 505 (2013)
("in interpreting [statutory] language . . . we do not
write on a clean slate, but are bound by our previous
judicial interpretations of this language and the purpose
of the statute").

Our recent decision in *Potvin* v. *Lincoln Service &
Equipment Co.*, supra, 298 Conn. 620, is particularly
instructive as to whether Exchange's preinsolvency
conduct during the underlying litigation has the effect of
estopping the association from challenging its liability
under the policy. In *Potvin*, we first concluded that
the association is statutorily immune, under General
Statutes § 38a-850, from an order by a Workers' Com-
pensation Commissioner imposing sanctions and attor-
ney's fees pursuant to General Statutes §§ 31-288 (b)
and 31-300 for its undue delay in processing payment
to a claimant on behalf of an insolvent insurer. See id.,
642. On the basis of that conclusion, we determined
that "the association can be liable for those sanctions
only if they fall within the meaning of the term 'covered
claim,' as defined in § 38a-838 (5), which the association
is required to pay under [General Statutes (Rev. to
2009)] § 38a-841 (1)." Id. We then concluded that the
Compensation Review Board improperly determined
"that the definition of '[c]overed claim' and our decision
in [*Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra,
278 Conn. 779] demonstrate that the association is liable
to the same extent as the insolvent insurer would have
been, including for sanctions." *Potvin* v. *Lincoln Ser-*

*vice & Equipment Co.*, supra, 643.

In so concluding, we emphasized that the "relevant portion" of § 38a-838 (5) "confines the extent of a covered claim to that 'which arises out of and is within' the coverage of the underlying insurance policy. . . . The text of the definition thus excludes any liabilities beyond those that arise out of and are within the insolvent insurer's insurance policy. This reading is consistent with our decision in *Fontaine,* in which we noted that the association was obligated only 'to the same extent that the insolvent insurer would have been liable under its policy.' . . . There is no evidence in the record that the insurance policy in the present case included an obligation on the part of the insurer to pay statutory penalties and attorney's fees in the event that it caused undue delay in the processing or payment of a claim. In the absence of such evidence, we conclude that the obligation to pay the sanctions does not arise out of the coverage of the policy *but, rather, that such obligation arises out of the association's conduct in handling the claim.* Thus, we conclude that the definition of 'covered claim' limits the association's obligations to those found in the insolvent insurer's insurance policy and does not extend to liabilities arising from conduct in handling the claim if such a provision is not included in the policy."[7] (Citations omitted; emphasis altered.) Id., 643–44, citing *Connecticut Ins. Guaranty Assn.* v. *Fontaine,* supra, 278 Conn. 791. Ultimately, this court concluded that, "[i]n the absence of any evidence that the sanctions imposed in this case were covered under the insolvent insurer's policy . . . the sanctions are not part of a covered claim and that the association, therefore, is not obligated to pay them." *Potvin* v. *Lincoln Service & Equipment Co.*, supra, 298 Conn. 646.

We conclude that *Potvin* is highly instructive with respect to determining the association's liability to Health Specialists and the Drowns because the default judgment and corresponding settlement agreement in the underlying malpractice action arose from a judicially imposed sanction of Exchange for its conduct in defending that litigation, namely, the imposition of a default judgment on Health Specialists as a consequence of Exchange's violation of two separate court orders requiring the attendance of a representative with settlement authority at pretrial mediation sessions scheduled for September and December of 2006. *Potvin* makes clear that the association's liability is strictly limited by the guaranty act to claims grounded in the terms of the policy issued by the insolvent insurer, in this case Exchange, particularly insofar as *Potvin* distinguished this court's earlier decision in *Fontaine* and limited it to matters of policy interpretation. See footnote 7 of this opinion. Indeed, in *Potvin,* we held that the association could not be held liable, either independently or by means of a covered claim, for a

sanction imposed by a Workers' Compensation Commissioner when the association *itself* had committed misconduct in the course of handling a claim on behalf of an insolvent insurer; *Potvin* v. *Lincoln Service & Equipment Co.*, supra, 298 Conn. 646; that fact distinguishes it from the present case, where the defendants seek, in essence, to hold the association vicariously liable for the misconduct of Exchange, the insolvent insurer.

Further, our conclusion that an insurer's preinsolvency conduct does not estop the association from challenging its obligation to pay under the terms of the policy is consistent with the association's "limited purpose of paying only 'covered' claims on behalf of insolvent insurers to insureds who otherwise would be left with a limited recovery, if any, following the insolvency of their insurer. . . . The association does not replace the insolvent insurer and does not assume all of the insolvent insurer's responsibilities and obligations. The guaranty act limits the extent of the association's obligations so that the association remains a limited purpose entity rather than a full service insurer." (Citation omitted.) Id., 639–40. "The protection [the association] provides is limited based [on] its status as a nonprofit entity and the method by which it is funded. . . . [T]he association becomes obligated pursuant to § 38a-841, to the extent of covered claims within certain limits. . . . Because [General Statutes] § 38a-849 provides that insurers may pass on the costs of the assessments made against them by the association, it is in reality policyholders who pay for the protections afforded by the association. Limitations on the association's obligations, therefore, provide another form of protection against increased premiums for policyholders in addition to the primary protection afforded all claimants against losses resulting from insurer insolvency. . . . The result is that policyholders, who in effect fund the association, pay only for protection for fellow policyholders and claimants in the event that an insurer becomes insolvent." (Citations omitted; internal quotation marks omitted.) Id., 640; see also *Esposito* v. *Simkins Industries, Inc.*, supra, 286 Conn. 329–31; *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 450–52. Thus, we conclude that the association is not estopped from challenging the existence of a covered claim, even when the insolvent insurer would otherwise have been bound to pay that claim because of a breach of its coverage obligation.[8]

None of the cases cited by the defendants hold to the contrary. In particular, their reliance on *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 791, is foreclosed by our treatment of that case in *Potvin* v. *Lincoln Service & Equipment Co.*, supra, 298 Conn. 643–44. See footnote 7 of this opinion. We similarly disagree with their reliance on *Hall* v. *MPH Transportation, Inc.*, supra, 58 Pa. D. & C.4th 501, wherein a Penn-

sylvania trial court held that, under the applicable statute,[9] a guaranty association had "an unconditional right to set aside a default judgment which occurred during the insurer's rehabilitation or insolvency and while the insurer and defendant were incapable of defending the claim on the merits. The same should not be true, however, for default judgments or verdicts that were entered at a time when the defendant and then solvent insurer had the ability to defend the claim and protect their interests."[10] In that context, the Pennsylvania court reasoned that the guaranty association "inherits both the feats and sins committed by the former insurer while solvent and reaps the benefits of the insurer's achievements, and suffers the consequences of its transgressions, during its solvency. For example, if [the insolvent insurer] had succeeded with [the insured's] preliminary objections and secured the dismissal of certain claims, [the guaranty association] would have been entitled to enjoy the benefit of that ruling. Conversely, if [the] plaintiffs have obtained a default judgment due to the failure of [the insured] and [the insolvent insurer] to timely answer the complaint while [the insolvent insurer] was still solvent, [the guaranty association] should not be granted the unfettered right to set aside that judgment at any time it chooses. If [the guaranty association] is truly deemed to be an insurer and is placed in the stead of the insolvent insurer, with all of that insurer's rights and duties and obligations . . . it should not be entitled to shirk responsibility for the insurer's conduct while it was solvent. To hold otherwise would defeat the [Pennsylvania's guaranty act's] express purpose of avoiding excessive delay in the payment of such claims." (Citation omitted; internal quotation marks omitted.) Id., 502.

Even assuming, without deciding, that the default and ultimate settlement agreement between the Drowns and Health Specialists constitute a "judgment" subject to reopening under General Statutes § 38a-851 (a),[11] which is Connecticut's counterpart of the statute at issue in *Hall*; see footnote 9 of this opinion; we agree with the association that *Hall* is not persuasive in this context. Rather, *Hall* is simply limited to the procedure by which judgments may be reopened, and is of minimal persuasive value because it does not address the threshold question whether an insolvent insurer's litigation conduct vis-á-vis its insured, including breaching its duty to defend or not timely reserving its rights under the policy, operates as an estoppel that creates a "covered claim" as a matter of law—regardless of the policy language involved. Indeed, we agree with the association that there is nothing in § 38a-851 (a) that alters the guaranty act's definition of "covered claim" in § 38a-838 (5), which moors the association's liability to claims that require "a set of facts and a right of recovery that arises out of and is within the coverage of the insolvent insurer's policy."

Thus, like the Appellate Court; see *Connecticut Ins. Guaranty Assn.* v. *Drown*, supra, 134 Conn. App. 158 n.12; we find more persuasive those sister state decisions[12] holding squarely that the conduct of an insolvent insurer does not bind an insurance guaranty association to pay an otherwise "uncovered claim." See *Illinois Ins. Guaranty Fund* v. *Santucci*, 384 Ill. App. 3d 927, 934, 894 N.E.2d 801 (2008) ("[The defendant] ignores [the fact] that the [guaranty fund] is not an insurance company and that [the insurer's] decision to defend without a reservation of rights does not bind the [guaranty fund]. Rather, by statute, the [guaranty fund] assumed the policy obligations of [the insurer] only to the extent that those obligations were statutorily defined 'covered claims.' "); *Valentin-Rivera* v. *New Jersey Property-Liability Ins. Guaranty Assn.*, Docket No. A-1925-09T1, 2011 WL 1085559, *6 (N.J. Super. App. Div. March 25, 2011) (insolvent insurer's defense without reserving rights did not estop guaranty association from challenging existence of "covered claim" because, inter alia, "conservation of [guaranty fund's] resources is necessary to achieve the [state guaranty act's] stated goals" [internal quotation marks omitted]); *Lopez* v. *Texas Property & Casualty Ins. Guaranty Assn.*, 990 S.W.2d 504, 506 (Tex. App. 1999) ("Because [the] appellants' claim is for a loss outside policy coverage, [the] appellants' claim for recovery of the judgment against [the insured] is not a covered claim under the terms and conditions of the policy. Therefore, the [g]uaranty [a]ssociation is [statutorily] prohibited from paying [the] appellants' claim," despite the fact that the insolvent insurer had defended the insured during the underlying action without reserving its rights.); accord *Property & Casualty Ins. Guaranty Corp.* v. *Beebe-Lee*, 431 Md. 474, 487, 66 A.3d 615 (2013) (that claim is not covered by insolvent insurer's policy provides "sound reason" for guaranty association to contest settlement).[13]

Like these sister state courts, we view expanding the definition of "covered claim" to bind the association, by estoppel, to make payments occasioned by the default of an insolvent insurer, when no coverage existed under the underlying policy issued by the insolvent insurer, as inconsistent with the association's limited purpose under the guaranty act. We conclude, therefore, that the Appellate Court properly determined that the "association is not estopped from enforcing the policy provisions." *Connecticut Ins. Guaranty Assn.* v. *Drown,* supra, 134 Conn. App. 159.

## II

We now turn to the defendants' claim that the Appellate Court improperly concluded that exclusion (i), which excludes vicarious liability coverage "with respect to *injury arising solely out of acts or omissions in the rendering or failure to render professional ser-*

*vices by individual physicians or nurse anesthetists, or by any paramedical for whom a premium charge is shown on the declarations page,*" plainly and unambiguously precludes coverage for the Drowns' claims against Health Specialists. (Emphasis added.) Noting that the Drowns' claims arise from Health Specialists' vicarious liability for the malpractice of Bourget, who is a physician not named on the declarations page, the defendants argue that exclusion (i) is ambiguous with respect to whether it applies to all claims arising solely from the negligence of physicians, or merely those physicians who are not named on the declarations page; thus, they contend that the policy, in accordance with the reasonable expectation of the insured under the contra proferentem rule, should be construed in favor of coverage. In demonstrating ambiguity, the defendants rely on condition (g) set forth in § VIII of the policy, which requires that individual physicians have their own personal coverage as a precondition to corporate coverage, to indicate that the policy contemplates coverage for vicarious liability arising from the acts of individual physicians who are not named on the declarations page. They argue that a contrary reading of the policy, and particularly exclusion (i), renders the coverage afforded by the policy illusory because "it does not make sense for an obstetrical medical group to buy a policy with no coverage for doctor malpractice," asking rhetorically why "such a group [would] leave itself completely exposed to vicarious liability claims based on its main liability (that of its physicians)." The defendants further argue that the association's construction of exclusion (i) does not satisfy *Johnson* v. *Connecticut Ins. Guaranty Assn.*, 302 Conn. 639, 31 A.3d 1004 (2011), which, they contend, stands for the proposition that, "where the interpretation offered by an insurer creates 'bizarre' and 'counterintuitive' results from the perspective of the insured, such an interpretation should only prevail where the language 'unambiguously and inexorably' leads to such a conclusion."

In response, the association, relying on sister state cases from New Jersey and Massachusetts, argues that the Appellate Court properly concluded that exclusion (i) plainly and unambiguous precludes coverage in this case. The association contends that there is nothing in the language, grammar, or syntax of exclusion (i) that suggests any ambiguity, and argues that the Appellate Court properly applied the last antecedent rule of construction to conclude that exclusion (i) plainly and unambiguously precludes coverage for claims arising "solely" from the malpractice of individual physicians, regardless of whether they are named on the declarations page of the policy. The association argues that the Appellate Court properly construed the policy as a whole to avoid conflicts between exclusion (i) and conditions of coverage, and also that coverage under the policy is not illusory because there are numerous

situations wherein the exclusion would not apply. Largely for the reasons well stated by the Appellate Court, we agree with the association that the policy purchased by Health Specialists plainly and unambiguously excluded vicarious liability coverage "with respect to injury arising solely out of acts or omissions in the rendering or failure to render professional services by individual physicians," insofar as it is undisputed that the claims at issue herein against Health Specialists arose solely from the actions of Bourget, its employee who is an individual physician, whose name is not recited on the policy's declaration page. See *Connecticut Ins. Guaranty Assn.* v. *Drown*, supra, 134 Conn. App. 152–54.

To provide context for our analysis of the contract interpretation issues in this appeal, we set forth the relevant provisions of the "Physicians' & Surgeons' Professional Liability Insurance Claims—Made" policy that Exchange issued to Health Specialists. The declarations page provides in relevant part:

"I. COVERAGE AGREEMENTS

"[Exchange] will pay on behalf of [Health Specialists] all sums that [Health Specialists] shall become legally obligated to pay as damages because of:

* * *

"Coverage B—Corporate/Partnership Liability

"Injury arising out of the rendering of or failure to render, on or after the retroactive date, professional services by any person for whose acts or omissions the corporation/partnership insured is legally responsible."

The "Exclusions" section of the policy provides in relevant part:

"II. EXCLUSIONS

"This insurance does not apply to liability of [Health Specialists]:

* * *

"(i) corporation/partnership under Coverage Agreement B with respect to *injury arising solely out of acts or omissions in the rendering or failure to render professional services by individual physicians or nurse anesthetists, or by any paramedical for whom a premium charge is shown on the declarations page.*" (Emphasis added.)

Section VIII of the policy, entitled "CONDITIONS OF INSURANCE," further provides:

"(g) Insurance for Others Required. The coverage provided under this policy shall not apply to any individual, partnership or corporation insured with respect to claims arising out of the acts or omissions of: (a) physician or nurse anesthetist employees of an individual, partnership or corporation insured, or (b) members

of an insured partnership or officers, directors or shareholders of an insured corporation, unless such persons have individual coverage for such claims at the time they are made under a physicians' and surgeons' or similar professional liability insurance policy with limits of liability equal to or greater than the limits of liability of the insured under this policy."

"Under our law, the terms of an insurance policy are to be construed according to the general rules of contract construction. . . . The determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . However, [w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. . . . [T]his rule of construction favorable to the insured extends to exclusion clauses. . . .

"Put differently, [a]lthough policy exclusions are strictly construed in favor of the insured . . . the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . The interpretation of an insurance policy is based on the intent of the parties, that is, the coverage that the insured expected to receive coupled with the coverage that the insurer expected to provide, as expressed by the language of the entire policy. . . . The words of the policy are given their natural and ordinary meaning, and any ambiguity is resolved in favor of the insured. . . . The court must conclude that the language should be construed in favor of the insured unless it has a high degree of certainty that the policy language clearly and unambiguously excludes the claim." (Citations omitted; internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 795–96, 967 A.2d 1 (2009). These principles of policy construction, which embody the rule of contra proferentem, continue to apply even when the association is challenging a coverage obligation under a policy that had been written and issued by a now insolvent insurer. *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 789–91.

We agree with the Appellate Court's well reasoned conclusion that exclusion (i) applied, despite the fact that Bourget's name was not shown on the declarations page, because the qualifying phrase, " 'for whom a premium charge is shown on the declarations page' in exclusion (i) does not apply to individual physicians . . . ." *Connecticut Ins. Guaranty Assn.* v. *Drown*,

supra, 134 Conn. App. 152. The Appellate Court, inter alia, properly applied the last antecedent rule of contractual and statutory construction, which provides that "qualifying phrases, absent a contrary intention, refer solely to the last antecedent in a sentence"; id., 151; and observed that "the phrase 'for whom a premium charge is shown on the declarations page' is not grammatically or logically separated from the last antecedent phrase 'any paramedical,' " and "interpret[ed] the phrase to apply only to the last antecedent, 'any paramedical.' " Id.

As the Appellate Court aptly observed, the "use of a comma, the repeated use of the disjunctive conjunction 'or' and the repeated use of the word 'by' grammatically separates the portion of exclusion (i) referring to individual physicians and nurse anesthetists from the portion of exclusion (i) referring to paramedicals. In light of this separation, we read the phrase 'for whom a premium charge is shown on the declarations page' to modify only the 'paramedical' category. 'It is well recognized that, whenever possible, a modifier should be placed next to the word it modifies.' . . . Moreover, 'the use of the disjunctive conjunction "or" unambiguously requires that either of the exclusions separated by the conjunction, if applicable, excludes coverage.' " (Citations omitted; emphasis omitted.) Id., 150–51; see also *Harris Data Communications, Inc.* v. *Heffernan*, 183 Conn. 194, 197, 438 A.2d 1178 (1981); *Horak* v. *Middlesex Mutual Assurance Co.*, 181 Conn. 614, 616–17, 436 A.2d 783 (1980).

We agree with the dissent that, as a general matter, principles such as the last antecedent rule, as well as considerations such as the placement of punctuation; see, e.g., *Chandler-McPhail* v. *Duffey*, 194 P.3d 434, 440–41 (Colo. App. 2008); *Liebovich* v. *Minnesota Ins. Co.*, 310 Wis. 2d 751, 771–72, 751 N.W.2d 764 (2008); are merely means to an ultimate end, which is to determine the intent of the parties to the insurance contract, with the understanding that the "[t]he provisions of the policy issued by the defendant cannot be construed in a vacuum. . . . They should be construed from the perspective of a reasonable layperson in the position of the purchaser of the policy." (Internal quotation marks omitted.) *Community Action for Greater Middlesex County, Inc.* v. *American Alliance Ins. Co.*, 254 Conn. 387, 400, 757 A.2d 1074 (2000). The Appellate Court's application of the last antecedent rule in this case was not, as the dissent suggests, an improperly hypertechnical approach to contract interpretation that superseded a reasonable, contextual reading of an insurance contract. Rather, the Appellate Court properly applied the last antecedent rule to yield a construction that is consistent with a broader, contextual reading of the insurance contract.

Thus, we disagree with the dissent's argument that

the Appellate Court's construction of the policy "seems counterintuitive in its real world application," given that "[n]either [we], nor the Appellate Court, nor the association has offered a reasonable explanation as to why Health Specialists, or any other obstetrical practice for that matter, would purchase a corporate liability policy that would exclude from coverage for the most obvious source of its potential liability, the negligence of its physicians, under most circumstances."[14] To this end, the defendants and the dissent contend that condition (g) renders the Appellate Court's reading of exclusion (i) improper because, when the condition and the exclusion are read together, they suggest that vicarious liability coverage under the policy is illusory. We respectfully disagree with this reading of the policy language.

As noted previously, condition (g) requires the maintenance of individual professional liability coverage for physician or nurse anesthetist employees as a condition for vicarious liability coverage. Read in conjunction with exclusion (i), condition (g) does not, however, render illusory the vicarious liability coverage provided by coverage B on the declarations page of the policy (coverage B). First, condition (g) is written more broadly than exclusion (i)—it requires individual coverage as a condition precedent for corporate coverage for all "claims arising out of the acts or omissions of: (a) physician or nurse anesthetist employees of an individual, partnership or corporation insured . . . ." In contrast, exclusion (i) excludes only those vicarious liability claims for "injury *arising solely out of acts or omissions* in the rendering or failure to render professional services by individual physicians or nurse anesthetists, or by any paramedical for whom a premium charge is shown on the declarations page." (Emphasis added.) Given the differences in their wording, these sections can be harmonized in a coherent manner rendering coverage nonillusory because the wording of exclusion (i) is narrower than that of condition (g) and the general grant of coverage in coverage B.

Specifically, the term "solely" in exclusion (i) makes clear that the involvement of a physician or nurse anesthetist in the events giving rise to a claim arising in whole or in part from the actions of an unscheduled paramedical would not preclude corporate coverage, while the remainder of the exclusion makes clear that coverage B cannot be used as a means to avoid the purchase of adequate individual professional liability coverage for those named in the exclusion, namely, physicians, nurse anesthetists, or scheduled paramedical personnel. This means that, viewing these provisions together, the corporate protection in coverage B is not rendered illusory because it encompasses claims wherein an unscheduled paramedical acted, with or without the participation of a physician or nurse anesthetist, to cause injury in the course of rendering or

failing to render professional service. It plainly and unambiguously covers a certain risk for Health Specialists, namely, its vicarious liability for the acts and omissions of unscheduled paramedical personnel such as nonanesthetist nurses and physician's assistants, who have liability exposure or legal obligations that puts them beyond the realm of those providers who are required to carry malpractice coverage. See General Statutes § 20-11b (a) (requiring licensed physicians and surgeons who provide "direct patient care services" to "maintain professional liability insurance or other indemnity against liability for professional malpractice" for at least $500,000 "for one person, per occurrence, with an aggregate of not less than one million five hundred thousand dollars"); General Statutes § 20-94c (a) (same requirement for advanced practice registered nurses, except for certified nurse anesthetists who provide "such services under the direction of a licensed physician"); see also footnote 11 of the dissenting opinion. Thus, we do not read the relationship between exclusion (i) and condition (g) as having the counterintuitive effect—namely, creating illusory coverage—claimed by the defendants.[15]

We further disagree with the dissent's conclusion that our construction of the policy "appears to render the term 'individual' superfluous." If correct, such a reading would, of course, contravene the well established method of reading insurance policies. See, e.g., *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 468, 870 A.2d 1048 (2005). We view the word "individual" as used in exclusion (i) to modify the words "physicians and nurse anesthetists," as needing to be read consistently with condition (g), which requires "individual coverage" for such providers as a condition of coverage for Health Specialists' vicarious liability arising from their negligence, which was available through the purchase from Exchange of coverage A on the declarations page (coverage A) for "[i]ndividual [p]rofessional [l]iability."[16] It also makes clear the difference between the coverage in coverage A, and that in coverage B, which specifically protects "a partnership . . . and any member thereof with respect to acts or omissions of others." Put differently, the word "individual" operates in the policy to emphasize the difference between a physician's liability for services rendered in his or her capacity as a health care provider, and a physician's vicarious liability as a member of a partnership.

Finally, the defendants' reliance on *Johnson* v. *Connecticut Ins. Guaranty Assn.*, supra, 302 Conn. 639, is misplaced. Although that case also involved language identical to exclusion (i), it is distinguishable. In *Johnson*, we concluded that the language of exclusion (i) was ambiguous as applied in that case, which involved whether coverage existed for claims arising solely from the negligence of a paramedical employee; the issue

therein was whether she was a " 'paramedical for whom a premium charge is shown on the declarations page.' " (Emphasis omitted.) Id., 644–45. We construed the policy in favor of coverage because the declarations page simply noted " 'included' " with respect to a premium for coverage for paramedical employees as a class; we stated the use of that term "does not ambiguously show a premium charge for that class on the declarations page." Id., 651–52. Because of differences in the language at issue, *Johnson* does not control or significantly inform our decision in the present case.

Accordingly, we conclude that the Appellate Court properly determined that the policy is not illusory, and plainly and unambiguously does not cover Health Specialists for its vicarious liability arising solely from the acts or omissions of its physicians.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and PALMER, ZARELLA and ESPINOSA, Js., concurred.

[1] We refer in this opinion to Joshua Drown, Susan Drown and Rodney Drown collectively as the Drowns and individually by name.

[2] We granted the defendants' petition for certification to appeal to this court limited to the following issues: (1) "Did the Appellate Court properly determine that exclusion (i) . . . unambiguously excluded coverage in this case?"; and (2) "Did the Appellate Court properly determine that the [association] had immunity for the actions of [Exchange] committed prior to [Exchange's] insolvency?" *Connecticut Ins. Guaranty Assn.* v. *Drown*, 305 Conn. 908, 44 A.3d 183 (2012).

[3] General Statutes § 38a-841 (a) provides in relevant part: "Said association shall: (1) Be obligated to the extent of the covered claims existing prior to the determination of insolvency and arising within thirty days after the determination of insolvency, or before the policy expiration date if less than thirty days after the determination, or before the insured replaces the policy or causes its cancellation, if he does so within thirty days of such determination, provided such obligation shall be limited as follows: (A) With respect to covered claims for unearned premiums, to one-half of the unearned premium on any policy, subject to a maximum of two thousand dollars per policy; (B) with respect to covered claims other than for unearned premiums, such obligation shall include only that amount of each such claim which is in excess of one hundred dollars and is less than three hundred thousand dollars for claims arising under policies of insurers determined to be insolvent prior to October 1, 2007, and four hundred thousand dollars for claims arising under policies of insurers determined to be insolvent on or after October 1, 2007, except that said association shall pay the full amount of any such claim arising out of a workers' compensation policy, provided in no event shall said association be obligated (i) to any claimant in an amount in excess of the obligation of the insolvent insurer under the policy form or coverage from which the claim arises, or (ii) for any claim filed with the association after the expiration of two years from the date of the declaration of insolvency unless such claim arose out of a workers' compensation policy and was timely filed in accordance with section 31-294c; (2) be deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent . . . (4) investigate claims brought against said association and adjust, compromise, settle, and pay covered claims to the extent of said association's obligations, and deny all other claims. The association shall pay claims in any order it deems reasonable including, but not limited to, payment in the order of receipt or by classification. It may review settlements, releases and judgments to which the insolvent insurer or its insureds were parties to determine the extent to which such settlements, releases and judgments may be properly contested . . . ."

Although § 38a-841 has been the subject of recent amendments by our legislature; see, e.g., Public Acts 2010, No. 10-5, § 40; those amendments

have no bearing on the merits of this appeal. In the interest of simplicity, unless otherwise noted, we refer to the current revision of the statute.

[4] General Statutes § 38a-838 (5) provides in relevant part: " 'Covered claim' means an unpaid claim, including, but not limited to, one for unearned premiums, which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which sections 38a-836 to 38a-853, inclusive, apply issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971, and (A) the claimant or insured is a resident of this state at the time of the insured event; or (B) the claim is a first party claim for damage to property with a permanent location in this state . . . ."

[5] For a complete recitation of the language of relevant policy provisions, see part II of this opinion.

[6] Because this case does not involve a workers' compensation insurance policy, the association's maximum payment obligation is $400,000 for each claim. See General Statutes § 38a-841 (a) (1); see also footnote 3 of this opinion. In the present case, the Drowns asserted claims of $399,900 payable each to Susan Drown, Rodney Drown, and Joshua Drown, leading to a total obligation for the association of $1,199,700 should those claims be "covered." Had Exchange not become insolvent, the settlement agreement would have entitled the Drowns to the total $2 million policy limits.

[7] In *Potvin*, we distinguished and limited *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 791, rejecting the association's reliance on the language presently set forth in § 38a-841 (a) (2); see footnote 3 of this opinion; in support of the broad proposition "that the association is liable to the same extent as any insolvent insurer would be if that insurer had not become insolvent." *Potvin* v. *Lincoln Service & Equipment Co.*, supra, 298 Conn. 644. We held instead that "[t]he statute . . . deems the association to be the insurer *only 'to the extent of its obligations on the covered claims* . . . .' " (Emphasis added.) Id., 645; see also id. ("because we already have determined that the sanctions in the present case do not fall within the definition of 'covered claim' in § 38a-838 [5], the association is not 'deemed the insurer' for purposes of any sanctions imposed by the commissioner").

By way of background, we note that, in *Fontaine*, we rejected the association's claim that the contra proferentem rule, which generally requires construing ambiguous insurance contracts against the drafter, was inapplicable because the association itself did not draft the policy issued by the insolvent insurer. *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 789. This court observed that the "association does not point to any provision of the act purporting to alter the usual methods of interpreting insurance policies" and rejected its reliance on the history and limited purpose of the association stated in *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 451, emphasizing that the association "was established for the benefit of consumers." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 789–90; see also id., 791–92, citing *Connecticut Ins. Guaranty Assn.* v. *Union Carbide Corp.*, 217 Conn. 371, 390, 585 A.2d 1216 (1991) (" 'the legislative objective was to make the [association] liable to the same extent that the insolvent insurer would have been liable *under its policy*' " [emphasis added]).

[8] We recognize the defendants' policy based argument—framed by this court's statement in *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 791, that the association is obligated only " 'to the same extent that the insolvent insurer would have been liable under its policy' "—that upholding the Appellate Court's decision "would mean that [the association] is immune from the legal principles that ordinarily govern determination of insurance coverage. Instead, [the association] would be the one entity in the legal system who could always defend on policy interpretation grounds, regardless of the prior conduct of a solvent insurance company. For example, even where a solvent insurance company had previously adjusted and settled a claim, so long as the check was not yet cashed, [the association] could step in and defend on policy interpretation grounds. In this case, [the association] simply wants to ignore the six year history of [Exchange's] conduct during the underlying litigation and the Appellate Court's grant of immunity to [the association] allows it to do precisely that." The defendants further contend that this conclusion "can upset the reasonable expectations of litigants, as it did in this case. Since any insurance company could conceivably become insolvent at any time, any contract or default judgment involving an insurance company would be useless until the settlement check cleared. [The association] could always come in, turn back the clock, and deny coverage on

policy interpretation grounds. Under this system, litigants cannot effectively plan, and lawyers cannot protect their clients' interests, because the rules could change at any moment. There needs to be some continuity between an insurance company and [the association] if the system is to function properly."

First, we conclude that the defendants' arguments, including that the Appellate Court "invented its own questionable policy assumption—that the [guaranty act] was designed primarily to benefit consumers of insurance, i.e., policyholders," are inconsistent with the association's limited statutory purpose, which has been well established in our case law. See, e.g., *Esposito* v. *Simkins Industries, Inc.*, supra, 286 Conn. 329–31; *Hunnihan* v. *Mattatuck Mfg. Co.*, supra, 243 Conn. 450–52.

Second, the legislature, in enacting the guaranty act, contemplated some degree of instability in the expectations of parties following the default or failure to defend by an insolvent insurer, as General Statutes § 38a-851 (a) expressly permits the association to ask a court to set aside the resulting "judgment, order, decision, verdict or finding" to allow it to "defend against any such claim on the merits of the case." Section 38a-851 (a) limits this authority, however, to "covered claims." It would be wholly inconsistent with the purpose of the guaranty act, and an absurd result, to permit the association to move for the reopening of "covered claims," yet bind it to pay those claims outside the coverage of the policies issued by the insolvent insurer.

Finally, we note that this case simply does not present the factual scenario posited by the defendants, where the "rules . . . change at any moment," inhibiting attorneys from "protect[ing] their clients' interests . . . ." The record demonstrates that the Drowns were aware of the coverage issues prior to entering into the settlement agreement with Health Specialists, which allowed them to proceed directly against Exchange, and ultimately the association given the insolvency of Exchange, while giving up their right to proceed against Health Specialists' assets. See *Connecticut Ins. Guaranty Assn.* v. *Drown*, supra, 134 Conn. App. 145 and n.4.

[9] The statute at issue in *Hall* "addresses default judgments which have been entered against the insolvent insurer and provides:

" 'As to any covered claims arising from a judgment under any decision, verdict or finding based on the default of the insolvent insurer or its failure to defend an insured, the association, either on its own behalf or on behalf of such insured, may apply to have such judgment, order, decision, verdict or finding set aside by the same court that made such judgment, order, decision, verdict or finding and shall be permitted to defend against such claim on the merits.' " *Hall* v. *MPH Transportation, Inc.*, supra, 58 Pa. D. & C.4th 495, quoting 40 Pa. Stat. Ann. § 991.1819 (b) (West 2002).

[10] The Pennsylvania court deemed that interpretation consistent with statutory language; see footnote 9 of this opinion; that "refers to judgments 'based on the default of the insolvent insurer' and implies that the default took place while the insurer was 'insolvent' and unable 'to defend an insured,' rather than when it was solvent and simply unwilling to do so." (Emphasis omitted.) *Hall* v. *MPH Transportation, Inc.*, supra, 58 Pa. D. & C.4th 501.

[11] General Statutes § 38a-851 (a) provides in relevant part: "Whenever any covered claims arise from a judgment under any decision, verdict or finding based on the default of an insolvent insurer or based on such insolvent insurer's failure to defend an insured, said association, either on its own behalf or on behalf of such insured, may apply to have such judgment, order, decision, verdict or finding set aside by the same court or administrator that made such judgment, order, decision, verdict or finding and said association may defend against any such claim on the merits of the case."

[12] "Sister state decisions are helpful in construing and applying the guaranty act because it is based on a model statute drafted by the National Association of Insurance Commissioners that has been adopted in substantial part by the legislatures of many of our sister states . . . ." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 792 n.8.

[13] Our independent research has revealed some authority that provides limited support for the proposition that an insolvent insurer's conduct may operate to estop a guaranty association from challenging its coverage obligation under the policy, even under statutes requiring the existence of a "covered claim" to bind the association. See *California Ins. Guarantee Assn.* v. *Workers' Compensation Appeals Board*, 10 Cal. App. 4th 988, 998, 12 Cal. Rptr. 2d 848 (1992) (workers' compensation coverage obligation for insolvent insurer, created by estoppel because of agent's conduct representing that coverage existed creating oral binder of insurance, operated to bind

guaranty association because obligations of insolvent insurer included those created by law as well as policy). The Delaware Court of Chancery subsequently followed this California decision by estopping that state's guaranty association from refusing to defend an insured who had relied on the conduct of his insolvent insurer in defending him for more than four years without a reservation of rights or disclaiming coverage. See *Delaware Ins. Guaranty Assn.* v. *Sezna*, Docket No. Civ. A. 13070, 1994 WL 476166, *4 (Del. Ch. August 25, 1994) (holding "claim by estoppel is not expressly excluded from coverage" by statute defining "covered claim," and, "moreover, is encompassed within the meaning of and purpose behind the [state's guaranty act]"), aff'd, 659 A.2d 227 (Del. 1995).

In our view, these decisions are unpersuasive. The Delaware decision does not square its estoppel reasoning with the statutory definition of "covered claim," which has the same limitation as Connecticut's definition under § 38a-838 (5), "which arises out of and is within the coverage"; Del. Code Ann. tit. 18, § 4205 (6) (West 1994); but lacks the arguably broader language of California's definition, which refers to obligations "*imposed by law* and within the coverage of an insurance policy of the insolvent insurer . . . ." (Emphasis added.) Cal. Ins. Code § 1063.1 (c) (Deering 2009). Indeed, the 1992 California decision has been significantly narrowed by a subsequent decision, and held to apply only to workers' compensation policies, rather than other forms of insurance. See *Aloha Pacific, Inc.* v. *California Ins. Guarantee Assn.*, 79 Cal. App. 4th 297, 314, 93 Cal. Rptr. 2d 148 (2000) (noting that 1992 decision "does not hold that every estoppel affixed to an insolvent insurer will also be imposed upon [guaranty association]" [emphasis omitted]). Thus, we decline to follow these decisions.

We also note that a very recent decision from Maryland's highest court, *Property & Casualty Ins. Guaranty Corp.* v. *Beebe-Lee*, supra, 431 Md. 483–85, concerns when a guaranty association may "properly contest" a personal injury settlement entered into by an insurer prior to insolvency, as opposed to remaining obligated to continue to defend and pay. In discussing the lack of coverage under the policy as a ground for contesting a settlement, the Maryland court distinguished *Lopez* v. *Texas Property & Casualty Ins. Guaranty Assn.*, supra, 990 S.W.2d 504, and *Illinois Ins. Guaranty Fund* v. *Santucci*, supra, 384 Ill. App. 3d 927, as involving either a stipulation or a judicial finding that the claims at issue were not "covered claims" under the policy and guaranty association statute, although it described that as a "sound reason" to contest the settlement. See *Property & Casualty Ins. Guaranty Corp.* v. *Beebe-Lee*, supra, 487 and n.15. The court held that the state's guaranty act permitted the guaranty association "to review and properly contest settlements to the extent that the insolvent insurer could have had it not become insolvent. In addition, [the guaranty association] may contest settlements on limited grounds that would not have been available to the insurer. Once a claimant demonstrates that there has been a valid settlement, [the guaranty association] bears the burden of showing why the claim is excluded from coverage. These reasons include, but are not necessarily limited to, fraud, collusion, duress, mutual mistake, or the failure of the insurer to use reasonable care in investigating or settling the claim." Id., 493–94. Although this holding strongly suggests that lack of coverage is a reason for a guaranty association to contest a settlement, the Maryland court acknowledged, but did not address, the guaranty association's claim that the go-kart accident at issue was not covered under the applicable policies, concluding only that the facts demonstrated that the insolvent insurer had used "reasonable care" in evaluating the merits of the underlying case prior to settling it. See id., 493 ("[j]ust because [the guaranty association] might have been able to negotiate a better settlement or successfully defend the case at trial does not mean it can re-open the settlement agreement now").

[14] We specifically disagree with the dissent's reliance on the title of the policy, namely, "Physicians and Surgeons Professional Liability Claims Made Insurance," in support of its argument that the policy is ambiguous. The dissent contends that this title, along with the broad grant of coverage in coverage B for "[i]njury arising out of the rendering of . . . professional services by any person for whose acts or omissions the corporation/partnership [Health Specialists] is legally responsible," "seem[s] to suggest that coverage for such persons is precisely the policy's main purpose." (Emphasis omitted.) The title of an insurance policy cannot, however, be used to create ambiguity within the plain and unambiguous terms of the contract. See *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, supra, 290 Conn. 808 (exclusion for damage, injury, or illness claims " 'aris[ing] from . . . silica dust' " not rendered ambiguous by fact that title of that exclusion was "Asbestos Exclusion Endorsement," with no mention of silica).

[15] Indeed, as the association argues and the Appellate Court noted; see

*Connecticut Ins. Guaranty Assn.* v. *Drown*, supra, 134 Conn. App. 154; this conclusion is consistent with that of those limited sister state courts that have considered the question presented in the present appeal in interpreting insurance policies with identical language. See *Massachusetts Insurers Insolvency Fund* v. *Mountzuris*, Docket No. 081962B, 2009 WL 1663932, *3 n.9 (Mass. Super. April 21, 2009) (The court concluded that language identical to exclusion [i] did "not eliminate all coverage based on vicarious liability . . . but rather eliminates such coverage only where an injury arises solely out of acts or omissions by the persons identified in the provision. Conversely, then, the exclusion does not bar coverage for [the insured] in situations where an injury does not arise solely out of acts or omissions by the identified persons. The [c]ourt need not speculate as to what those situations might be; it is satisfied that the exclusion does not by its terms render . . . coverage under the policy illusory." [Emphasis omitted.]); *Valentin-Rivera* v. *New Jersey Property-Liability Ins. Guaranty Assn.*, supra, 2011 WL 1085559, *5 (concluding that "the grant of coverage . . . is broader than the exclusion since it provides coverage for the acts or omissions of, for example, a nurse or physician's assistant employed by [the insured]" and that "the coverage provided, when read in conjunction with the plain language of the exclusion and the policy as a whole, was not illusory").

[16] Coverage A defines "[i]ndividual [p]rofessional [l]iability" coverage as encompassing "[i]njury arising out of the rendering of or failure to render . . . professional services by the individual insured, or by any person for whose acts or omissions such insured is legally responsible, except as a member of a partnership . . . ." Read in context with the definitions of "[i]nsured" in § VI and "PERSONS INSURED" set forth in § III, an "individual" under coverage A is a human being who provides professional services, but is not a "paramedical employee," as compared to coverage B, which protects business entities such as corporations or partnerships.